UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION, )
    )
    Plaintiff, )
    ) Civil Action No.
vs. )
    )
EMERY W. HARRIS, )
    ) CV-03-J-0715-S
    Defendant. )
    )

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Securities and Exchange Commission ("Commission") files this Complaint for Injunctive and Other Relief and alleges as follows:

### INTRODUCTION

1.  Since at least 1999, HealthSouth Corporation ("HRC"), one of the nation's largest healthcare providers, has overstated its earnings by at least $1.4 billion. This massive overstatement occurred because HRC's founder, chief executive officer ("CEO") and chairman of the board, Richard M. Scrushy ("Scrushy"), insisted that HRC meet or exceed earnings expectations established by Wall Street analysts.

2.  When HRC's earnings fell short of such estimates, Scrushy directed HRC's accounting personnel to "fix it" by artificially inflating the company's earnings to match Wall Street expectations. To balance HRC's books, the false increases in earnings were matched by false increases in HRC's assets. By the third quarter of 2002, HRC's assets were overstated by at least $800 million, or approximately 10 percent of total assets.

3.  Defendant Emery Harris was employed at HRC since 1992 in various capacities within the Finance Department. Beginning at least as early as 1999, Harris helped devise

and implement the accounting entries that were used to artificially inflate the company's earnings to match Wall Street expectations.

4. Harris knew that HRC's financial statements filed with the Commission, including HRC's Form 10-Q for the period ended June 30, 2002, were materially misstated. In fact, the financial statements filed with the Form 10-Q report overstated HRC's earnings, identified on HRC's income statement as "Income Before Income Taxes And Minority Interests," by at least 4,700 %.

5. Defendant Harris has engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and acts and practices that aid and abet HRC's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b), 20(d) and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77t(e)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the defendants from engaging in transactions, acts, practices and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for

an officer and director bar, disgorgement of ill-gotten gains and prejudgment interest, other equitable relief, and for civil money penalties.

7. This Court has jurisdiction of this action pursuant to Sections 20(b), 20(d), 20(e) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. The defendant, directly and indirectly, has made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

9. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because defendant Harris resides within this district.

## THE DEFENDANT

10. **Emery W. Harris**, age 33, resides in Birmingham, Alabama and was employed at HRC from 1992 in various capacities within the Finance Department. Harris held various positions including: Accountant, Senior Accountant, Accounting Supervisor, Accounting Manager, Assistant Vice-President, and Vice President. He served as Group Vice President and Assistant Controller from March 2000 to the present.

## OTHERS INVOLVED

11. HealthSouth Corporation was incorporated in Delaware in 1984 and is headquartered in Birmingham, Alabama. HRC is the nation's largest provider of outpatient surgery, diagnostic and rehabilitative healthcare services. It owns or operates

over 1,800 different facilities throughout the United States and abroad, including inpatient and outpatient rehabilitation facilities, outpatient surgery centers, diagnostic centers, medical centers and other healthcare facilities.

12.     HRC's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act. For the year ended December 31, 2001, HRC reported total revenues of $4 billion and net income of $76 million. HRC's stock was listed on the New York Stock Exchange ("NYSE") and was actively traded under the symbol of "HRC."

13.     Richard M. Scrushy, age 49, founded HRC and served as its Chairman since 1994. He served as HRC's CEO from 1994 until August 27, 2002. On January 6, 2003, he reassumed the position of HRC's CEO. Shortly after HRC went public in 1986, Scrushy instructed HRC's senior officers and accounting personnel, including Ownes, to materially inflate HRC's earnings to match Wall Street analysts' expectations.

14.     HRC and Scrushy are defendants in a related matter, <u>SEC v. HeathSouth Corp. and Richard M. Scrushy</u>, Case No. CV-03-J-0615-S, which was filed in this Court on March 19, 2003.

### THE SCHEME TO OVERSTATE EARNINGS

15.     Shortly after HRC became publicly traded in 1986, and at Scrushy's instruction, the company began to artificially inflate its earnings to match Wall Street analysts' expectations. Between 1999 and the second quarter of 2002, HRC intentionally overstated its earnings, identified as "Income Before Income Taxes And Minority Interests," by at least $1.4 billion in reports filed with the Commission.

16.     Beginning at least as early as 1999, Harris was required, in the third week of the last month of each fiscal quarter, to provide the chief financial officer ("CFO") and the

4

chief operating officer ("COO") with monthly and quarterly preliminary reports showing HRC's actual financial results. These reports would then be provided to Scrushy.

17. Sometime before 1999, in the course of providing this information, Harris learned that HRC's financial results were failing to produce sufficient earnings per share to meet or exceed earnings expectations established by Wall Street analysts.

18. HRC's senior officers and other employees, including Harris (from at least 1999), recognized that the earnings shortfall created a substantial risk that, unless HRC's earnings per share met analysts' expectations, the market price of HRC's securities would decline. The value of stock options owned by, and bonuses paid to, certain HRC senior officials depended in part on HRC meeting earnings expectations.

19. If HRC's actual results fell short of expectations, Scrushy and the COO provided HRC's accounting staff with the desired earnings per share number and instructed them to "fix it" by recording false earnings in HRC's accounting records to make up the shortfall.

20. HRC's accounting staff, including Harris, then met to discuss ways to inflate artificially HRC's earnings in order to meet the Wall Street earnings expectations. These meetings were known as "family" meetings. At the meetings, the "family" members discussed how members of the accounting staff would falsify *HRC's* books to fill the "gap" or "hole" to meet the earnings per share number that Scrushy had established. The fraudulent postings used to fill the "gap" or "hole" were referred to as the "dirt."

21. Harris and others made and caused to be made false and fraudulent entries HRC's books and records for the purpose inflating artificially HRC's earnings and earnings per share in order to comply with Scrushy's instructions.

5

22. Harris, acting on instructions from certain senior officials, instructed HRC's accounting staff to manipulate certain of the accounts on HRC's books and records to accomplish this purpose. The methods they used for artificially inflating the company's earnings and earnings per share included falsifying the "contractual adjustment" account and decreasing other expenses.

23. After manipulating the "contractual adjustment" and other expense accounts to artificially inflate revenue on the Income Statement, Harris and others made and caused to be made corresponding fraudulent adjustments to increase assets and decrease liabilities on HRC's Balance Sheet. Thus, false and fraudulent entries were made to accounts in HRC's books and records including, but not limited to, the: (1) Property, Plant and Equipment ("PP&E") account; (2) cash account; (3) inventory account; and (4) intangible asset (goodwill) accounts. Each of these accounts were reported in HRC's Balance Sheets.

24. Harris knew that the entries made to HRC's books and records to inflate HRC's earnings had no factual basis. He also knew that the entries were prohibited under Generally Accepted Accounting Principles ("GAAP").

25. At the direction of senior accounting officers, Harris and others falsified HRC's books and records by making thousands of phony asset entries to the PP&E accounts of HRC's various medical facilities. In some cases, when these facilities were sold, Harris and others, in order to continue the scheme, moved hundreds of millions of dollars of fraudulently created assets to other hiding places on HRC's books and records including its cash accounts.

26.     Harris and others instructed HRC's accounting personnel to design the fictitious accounting entries to avoid their detection. For example, if the accounting staff decided to increase inventories, it would increase inventory accounts at various HRC facilities by different false amounts because they knew that if amounts were increased uniformly, the auditors might become suspicious. In addition, since the HRC accounting staff knew that auditors questioned additions to the PP&E account which exceeded a certain threshold, they kept the false additions to the PP&E account at a particular facility below that threshold.

27.     Harris and others created and caused to be created false documents to be provided to HRC's auditors for the purpose of concealing the massive accounting fraud. The names of fraudulently enhanced property accounts were changed to make the false accounts appear routine. Further, if HRC's auditors questioned a particular asset account, Harris and others in HRC's accounting department created false invoices and provided them to the auditors.

28.     Harris and others made and caused to be made false and fraudulent journal entries in HRC's books and records knowing: (1) that such journal entries would ultimately be reflected in HRC's financial statements and public filings with the Commission; and (2) that HRC's financial statements and public filings would falsely overstate HRC's revenue, earnings and earnings per share.

29.     Harris and others caused HRC to file with the Commission annual reports and quarterly reports that materially misstated, among other things, HRC's net income, revenue, earnings per share, assets, and liabilities from at least 1999 until the present. As a result of the scheme, HRC's revenue and earnings were inflated by hundreds of millions

of dollars in publicly filed reports. For example, the Balance Sheet included in HRC's 10-Q for the second quarter of 2002, overstated gross PP&E by approximately $1 billion or approximately 33% of the total PP&E reported. The amount of cash reported on the same 10-Q was overstated by more than $300 million and the company's total assets were overstated by more than $1.4 billion.

## CLAIMS FOR RELIEF

## COUNT I—FRAUD

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

30.  Paragraphs 1 to 29 are hereby realleged and are incorporated herein by reference.

31.  Defendant Harris, from at least 1999 through the second quarter of 2002, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

(a) directly and indirectly employed devices, schemes and artifices to defraud purchasers of such securities;

(b) directly and indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading; and

(c) engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

32.  Defendant Harris knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud. In engaging in such devices, schemes and artifices to defraud, Harris acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

8

33. By reason of the foregoing, defendant Harris, directly and indirectly, has violated, is violating and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II--FRAUD

### Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

34. Paragraphs 1 through 29 are hereby realleged and are incorporated herein by reference.

35. Defendant Harris, from at least 1999 through the second quarter 2002, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

36. Harris knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Harris acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

37. By reason of the foregoing, Harris, directly and indirectly, has violated, is violating and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT III-AIDING AND ABETTING ANTIFRAUD VIOLATIONS

**Aiding and Abetting HRC's Violations of Section 17(A) Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10-b-5]**

38. Paragraphs 1 through 29 are hereby allewged and are incorporated herein by referernce.

39. Harris, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder which occurred when HRC, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

40. Harris knowingly, intentionally, and/or recklessly provided substantial assistance to the aforementioned devices, sachems and artifices to defraud. While providing such

assistance, Harris acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard of the truth.

### COUNT IV-AIDING AND ABETTING REPORTING PROVISIONS

**Aiding and Abetting HRC's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1, and 13a-13]**

41.   Paragraphs 1 through 29 are hereby realleged and are incorporated herein by reference.

42.   Harris, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, which occurred when HRC filed annual and periodic reports that contained financial statements that were not prepared in conformity with GAAP and contained material misstatements. Through the conduct described in the above paragraphs, Harris knowingly or recklessly substantially assisted HRC's violations of this section and rules.

### COUNT V- AIDING AND BETTING BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

**Aiding and Abetting HRC's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

43.   Paragraphs 1 through 29 are hereby realleged and are incorporated herein by reference.

44.   Harris, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(A) of the Exchange Act, which occurred when HRC failed to make and keep books, records, and accounts, which, in reasonable detail,

11

accurately and fairly reflected the transactions and dispositions of HRC's assets. Through the conduct described in the above paragraphs, Harris knowingly or recklessly substantially assisted HRC's violations of these sections.

45.     Harris, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(B) of the Exchange Act, which occurred when HRC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions were executed in accordance with management's general or specific authorization; (b) transactions were recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability of assets; (c) access to assets was permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Through the conduct described in the above paragraphs, Harris knowingly or recklessly substantially assisted HRC's violations of this section.

### COUNT V - BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder

46.     Paragraphs 1 through 29 are hereby realleged and are incorporated herein by reference.

47.     Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting

controls or knowingly falsifying any book, record, or account required by Section 13(b)(2)(A) of the Exchange Act. Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing the falsification of any such books, records or accounts. Through the conduct described above, Harris violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue a permanent injunction enjoining defendant Harris and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

    a.    from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    b.    from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

    c.    from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1];

    d.    from aiding and abetting violations of Section 17(a) of the Securities Act and Section 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13a-14 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13 and 240.13a-14]; and

e.   from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

III.

Issue an Order requiring defendant Harris to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

IV.

Issue an Order requiring defendant Harris, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1], to pay civil monetary penalties.

V.

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] prohibiting defendant Harris from acting as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C.§ 78o(d)].

VI.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as may be necessary and appropriate.

Dated: March 30, 2003                    RESPECTFULLY SUBMITTED,

_____ by AR
William P. Hicks
DISTRICT TRIAL COUNSEL
Ga. Bar No. 351649
Tel: 404 842-7675

_____
M. Graham Loomis
SENIOR TRIAL COUNSEL
Ga. Bar No. 457868
Tel: 404 842-7622

_____
Alex Rue
SENIOR TRIAL COUNSEL
Ga. Bar No. 618950
Tel: 404 842-7616


COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1234
(404) 842-7600
(404) 842-7679 fax